No. 11-30198

———————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————

ERROL HOUSTON, JR.,

Plaintiff-Appellant

v.

NEW ORLEANS CITY; LEON CANNIZZARO,
District Attorney for the Parish of Orleans; WARREN J. RILEY,
Superintendent of the New Orleans Police Department,

Defendants-Appellees

———————

**BRIEF AMICUS CURIAE OF THE NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC., IN SUPPORT OF APPELLANT
AND IN SUPPORT OF REVERSAL**

———————

Appeal from the U.S. District Court
for the Eastern District of Louisiana
District Court Civil No. 2:09-CV-4245

Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road
Suite 403
Fairfax, Virginia 22030
(703) 352-7276
Fax (703) 359-0938
dan@danpetersonlaw.com

Stephen P. Halbrook*
3925 Chain Bridge Road
Suite 403
Fairfax, Virginia 22030
(703) 352-7276
Fax (703) 359-0938
Email protell@aol.com
*Counsel of Record

Counsel for Amicus Curiae

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1,  the National Rifle Association of America,

Inc. (hereinafter "NRA"), has no parent corporation.  Since it has no stock, no publicly

held company owns 10% or more of its stock.


 /s/ Stephen P. Halbrook
Stephen P. Halbrook

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF INTEREST OF AMICUS CURIAE . . . . . . . . . . . . . . . . . . . . 1

STATEMENT PURSUANT TO FED. R. APP. P. 29 (c). . . . . . . . . . . . . . . . . . 3

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. DEFENDANTS' CONTINUING RETENTION OF THE FIREARM
INFRINGES ON PLAINTIFF'S SECOND AMENDMENT RIGHTS. . . . . . . . . . 6

A. The State May Not Retain a Firearm for the Duration of a Lengthy
 Statute of Limitations Once the Criminal Proceedings Are Terminated. . . . . . . . 6

B. A Person Has a Second Amendment Right to His or Her Particular
Firearm, a Right Which is Not Extinguished by One's Ability
to Acquire Another Firearm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. THE CORE SECOND AMENDMENT RIGHT IS FUNDAMENTAL
AND IS SUBJECT TO STRICT SCRUTINY, NOT SOME LESSER
DEGREE OF SCRUTINY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A. The Right is Fundamental and Requires Strict Scrutiny. . . . . . . . . . . . . . . . . 16

B. Intermediate Scrutiny or Anything Less Than Strict Scrutiny is
Not the Appropriate Standard of Review for a Significant Restriction
on the Core Right to Keep Arms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III. THE CITY'S POLICY OF RETAINING FIREARMS IN ALL
INSTANCES DOES NOT SURVIVE STRICT SCRUTINY. . . . . . . . . . . . . . . 21

A.  The Interests Asserted to Support Defendants' Actions Are
Not Compelling or Even Applicable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

B.  Defendants' Policy is Not Narrowly Tailored to Meet
Constitutional Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

CONCLUSION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

# TABLE OF AUTHORITIES

**CASES**                                                              **Page**

*Abrams v. Johnson*, 521 U.S. 74  (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Arizona v. Gant*, 129 S. Ct. 1710 (2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Bemis v. Kelley*, 671 F. Supp. 837 (D. Mass. 1987). . . . . . . . . . . . . . . . . . . . . . .  23

*Bryte v. City of La Mesa,* 255 Cal. Rptr. 64 (1989). . . . . . . . . . . . . . . . . . . . . . .  26

*Burdick v. Takushi*, 504 U.S. 428 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Cooper v. City of Greenwood,* 904 F.2d 302 (5th Cir.1990). . . . . . . . . . . . . . . . . .  7

*Dickerson v. City of Denton*, 298 F. Supp. 537 (E.D. Tex. 2004). . . . . . . . . . . . .  23

*District of Columbia v. Heller,* 554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . *passim*

*Fantasy Ranch Inc. v. City of Arlington*, 459 F.3d 546 (5th Cir. 2006). . . . . . . . . .  8

*Ford v. Turner*, 531 A.2d. 233 (D.C. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Hunter v. City of Electra*, No. 7:03-CV-153, 2006 WL 1814150, at *7
(N.D. Tex. June 29, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Freedman v. State of Maryland*, 380 U.S. 51 (1965). . . . . . . . . . . . . . . . . . . . . .  8, 9

*Garcha v. City of Beacon*, 351 F. Supp. 2d 213 (S.D. N.Y. 2005).. . . . . . . . . . . . .  9

*Kuck v. Danaher*, 600 F.3d 159 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Louisiana Debating & Literary Ass'n v. City of New Orleans*,
42 F.3d 1483 (5th Cir. 1995), *cert. denied*, 515 U.S. 1145 (1995). . . . . . . . . .  18, 21

*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . *passim*

*Miller* v. *Johnson*, 515 U.S. 900 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*National Rifle Ass'n v. City of Chicago*, 567 F.3d 856 (7th Cir. 2009),
 *rev'd. sub nom.*, *McDonald v. City of Chicago*, 130 S.Ct. 48 (2009) . . . . . . . . . . 3

*National Rifle Ass'n v. Nagin,* Civil Action No. 05-4234,
2005 WL 2428840 (E.D. La. Sept. 23, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Poe v. Ullman*, 367 U.S. 497 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*San Antonio Independent School District v. Rodriguez*,
411 U.S. 1 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) . . . . . . . . . . . . 11

*Teitel Film Corporation v. Cusack*, 390 U.S. 139 (1968). . . . . . . . . . . . . . . . . 8, 9

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . 20

*United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003). . . . . . . . . . . . . . . . 18

*United States* v. *Emerson*, 270 F.3d 203 (5th Cir. 2001),
*cert. denied*, 536 U.S. 907 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . 20

*United States v. Roach*, 201 Fed.Appx. 969 (5th Cir. 2006). . . . . . . . . . . . . . 21, 22

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 20

*United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363 (1971). . . . . . . . . 8

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . 20

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . 20

iv

*Valley Forge Christian College v. Americans United
for Separation of Church & State, Inc.*, 454 U.S. 464 (1982). . . . . . . . . . . . . . . . .  8

*Washington v. Glucksberg*, 521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . .  19

*Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009).. . . . . . . . . . . . . . . . . . .  19

*Zauderer v. Office of Disciplinary Counsel of
Supreme Court*, 471 U.S. 626 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

## CONSTITUTION AND STATUTES

U.S. Const., Amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 7, 10, 17

U.S. Const., Amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const., Amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 5, 14, 16

1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689).. . . . . . . . . . . . . . . . . .  11

18 U.S.C. § 922(g)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Civil Rights Act of 1866. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

La. Rev. Stat. § 15:41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 26

La. Rev. Stat. § 40:1798(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24, 25, 26

## OTHER AUTHORITIES

1 Blackstone 136, 139-140 (1765). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Cong. Globe, 39th Cong., 1st Sess. 478 (1866). . . . . . . . . . . . . . . . . . . . . . . . .  15

2 *Documentary History of the Ratification of the
Constitution* 623-24 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

4 *Documentary History of the First Federal Congress* 10 (1986). . . . . . . . . . . . .  14

6 *Documentary History of the Ratification of the
Constitution* 1453 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 13

11 *Documentary History of the First Federal Congress* 1291-92 (1992). . . . . . .  10

18 *Documentary History of the Ratification of the Constitution* 188 (1995). . . . .  13

Exec. Doc. No. 70, 39th Cong., 1st Sess., 233, 236 (1866). . . . . . . . . . . . . . . . .  15

*Federal Gazette*, June 18, 1789, at 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

2 *Journals of the Continental Congress, 1774-1779* (1905) . . . . . . . . . . . . . . . .  13

Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment,
and the Right to Bear Arms* 57-58 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 16

Stephen P. Halbrook, "'Only Law Enforcement Will Be
Allowed to Have Guns': Hurricane Katrina and the
New Orleans Firearm Confiscations," 18 *George Mason
University Civil Rights Law Journal* 339 (Spring 2008). . . . . . . . . . . . . . . . . . . .  2

Stephen P. Halbrook, *The Founders' Second
Amendment* 83, 257-58 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 14

## STATEMENT OF INTEREST OF AMICUS CURIAE

The National Rifle Association of America, Inc. ("NRA") is a New York not-for-profit membership corporation founded in 1871.  NRA has four million individual members and 10,700 affiliated members (clubs and associations) nationwide.  Among its purposes, as set forth in its Bylaws, are:

 1.  To protect and defend the Constitution of the United States, especially with reference to the inalienable right of the individual American citizen guaranteed by such Constitution to acquire, possess, transport, carry, transfer ownership of, and enjoy the right to use arms, in order that the people may always be in a position to exercise their legitimate individual rights of self-preservation and defense of family, person, and property, as well as to serve effectively in the appropriate militia for the common defense of the Republic and the individual liberty of its citizens;

 2.  To promote public safety, law and order, and the national defense;

 3.  To train members of law enforcement agencies, the armed forces, the militia, and people of good repute in marksmanship and in the safe handling and efficient use of small arms;

 4.  To foster and promote the shooting sports, including the advancement of amateur competitions in marksmanship at the local, state, regional, national, and international levels;

 5.  To promote hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources.

 The Court's decision in this case may materially affect NRA members in

the States composing the Fifth Circuit generally and in New Orleans in particular. This case involves the refusal of New Orleans police to return a firearm almost three years after it was confiscated during an arrest and after criminal charges were dropped. The NRA has a strong interest in ensuring that New Orleans' policies of returning seized firearms are consistent with constitutional requirements.

In the wake of Hurricane Katrina, New Orleans police implemented a policy of confiscating all firearms from private citizens.[1]   The NRA obtained a preliminary injunction prohibiting the Mayor and the Superintendent of Police "[f]rom confiscating lawfully-possessed firearms from citizens, including, but not limited to, . . . members of Plaintiffs National Rifle Association" *et al.*, and ordering them to "to return any and all firearms" to such persons.   Consent Order, *National Rifle Ass'n v. Nagin,* Civil Action No. 05-4234, 2005 WL 2428840 (E.D. La. Sept. 23, 2005) (Hon. Jay C. Zainey).  A permanent injunction was later issued which "enjoined and ordered [Defendants] to cease and desist confiscating lawfully-possessed firearms from all citizens, including, but not limited to, members of plaintiffs National Rifle Association of America," *et al.*, and ordering Defendants to "attempt to return any and all firearms which may have been confiscated" to such persons.   Consent Order Granting

---

[1]*See* Stephen P. Halbrook, "'Only Law Enforcement Will Be Allowed to Have Guns': Hurricane Katrina and the New Orleans Firearm Confiscations," 18 *George Mason University Civil Rights Law Journal* 339 (Spring 2008).

Permanent Injunction, *id*. (Oct. 9, 2008) (Hon. Carl J. Barbier).  A copy of the

Consent Order Granting Permanent Injunction is included as Exhibit A.

Moreover, the issue here involves whether a policy of refusing to return firearms

violates the Second Amendment right to keep and bear arms, an issue on which the

NRA has long-standing expertise in litigation.  *E.g.*, *National Rifle Ass'n v. City of*

*Chicago*, 567 F.3d 856 (7th Cir. 2009), *rev'd. sub nom.*, *McDonald v. City of Chicago*,

130 S.Ct. 48 (2009) (holding that the Second Amendment applies to the States through

the Fourteenth Amendment).  This brief seeks to assist the Court by providing analysis

of Second Amendment history and jurisprudence not set forth in the briefs of the

parties.

## STATEMENT PURSUANT TO FED. R. APP. P. 29(c)

This brief is filed in support of Appellant and seeks reversal of the judgment

below.  Appellant consents to the filing of this amicus curiae brief.  Appellee

Cannizzaro has refused to consent to its filing, and Appellees City of New Orleans and

Riley have not responded to a timely submitted request for consent.  The NRA seeks

to file this brief pursuant to its Motion for Leave to File Amicus Brief, submitted

herewith.

No party's counsel authored this brief in whole or in part.  No party or party's

counsel contributed money that was intended to fund preparing or submitting this

brief.  No person – other than the amicus curiae, its members, or its counsel – contributed money that was intended to fund preparing or submitting the brief.

## ARGUMENT

### Introduction

A principal issue in this case is whether police seizure of a firearm and indefinite retention thereof for the entire period of the statute of limitations of a criminal charge of six years, where the charge has been long dismissed and no realistic possibility exists that it will be refiled, infringes on the right to keep and bear arms guaranteed by the Second Amendment.

The District Court stated that "Plaintiff has failed to allege sufficient facts to show that Defendants have violated Plaintiff's Second Amendment right to bear arms by retaining Plaintiff's firearm." Rec. Doc. 61 at 6.  However, the question presented is not the sufficiency of the facts alleged.  The facts are undisputed.  Defendants seized Plaintiff's firearm in 2008, have twice refused to go forward with a prosecution of him, and have not alleged that there is any ongoing investigation of him.  Nevertheless, they are still refusing to return his lawfully owned firearm for a period of at least six years.

The issue here is purely one of law.  The text of the Second Amendment

4

mandates that the right to "keep and bear arms, shall not be infringed." There is no contention that Plaintiff is disqualified by law from owning or possessing a firearm. He has a Second Amendment right to keep and bear arms just as any other American citizen does, even though he was arrested once, several years ago.

Since Defendants have confiscated Plaintiff's firearm and have refused to return it without justification, they have violated his right to "keep" that arm in the most literal sense. As shown below, such a direct infringement would not be tolerated for other constitutional rights, such as with materials that may be protected under the First Amendment. Two recent decisions of the Supreme Court have made it clear that the constitutional right to keep and bear one's private arms is fundamental, and is accorded equal status with the fundamental guarantees in other enumerated rights. *District of Columbia v. Heller,* 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010).

The events preceding the adoption of the Second Amendment, the history of its adoption and ratification, and contemporaneous historical sources regarding the ratification of the Fourteenth Amendment confirm that a central purpose of those two amendments was to prevent unlawful seizure of arms, and to ensure that those arms be restored if wrongfully seized. *Heller* and *McDonald* both relied heavily on such sources to demonstrate the purposes of the Second Amendment and its protection of

individually owned private arms. The District Court's holding that a privately owned firearm may be seized and retained by the state on the excuse that the citizen may purchase another is contradicted by the historical record.

To the extent a constitutional standard of review applies, the test to be applied is strict scrutiny. The test is not intermediate scrutiny, or some undefined level of scrutiny that is merely "more than rational basis," which is the test applied by the District Court. Rec. Doc. 61 at 9, n.2. The interests identified by the District Court as supporting this invasion of Plaintiff's Second Amendment rights are far from compelling. To the extent that the state has an interest in retaining a firearm for evidentiary purposes, that interest could easily be protected by measures that are far more narrowly tailored than the blunderbuss remedy of keeping all firearms for the maximum period of the statute of limitations.

## I.  DEFENDANTS' CONTINUING RETENTION OF THE FIREARM INFRINGES ON PLAINTIFF'S SECOND AMENDMENT RIGHTS

### A.  The State May Not Retain a Firearm for the Duration of a Lengthy Statute of Limitations Once the Criminal Proceedings Are Terminated

Defendants submitted nothing, such as sealed evidence for the judge to view *in camera* of any continuing investigation, to justify the retention of the firearm in this case. The lower court seems to have assumed that the state could establish any statute of limitations, and the seized firearm may be retained by the police for its duration.

6

Here, where almost three years have passed and no reasonable probability exists that the dismissed charge will be reinstated, it is unreasonable to allow the police to retain the firearm any longer, much less for the full six years.

"The general rule is that seized property, other than contraband, should be returned to its rightful owner once the criminal proceedings have terminated." *Cooper v. City of Greenwood,* 904 F.2d 302, 305 (5th Cir.1990) (citations omitted). The criminal proceedings in this case have terminated – the charges were first refused by the District Attorney, and later charges were dropped. *Cooper* did not even consider the higher standard required by the Second Amendment.

Police may not seize constitutionally-protected items, whether books or firearms, and hold them indefinitely pending passage of a lengthy statute of limitations while not pursuing a criminal prosecution or a forfeiture action. *Heller* made repeated analogies between the First and Second Amendments.[2] *McDonald*, 130 S.Ct. at 3043, rejected the view "that the Second Amendment should be singled out for special – and specially unfavorable – treatment." It refused "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill

---

[2]*E.g.*, *Heller*, 554 U.S. at 628 n.27 (rational basis "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech . . . or the right to keep and bear arms."); *id*. at 635 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions . . ., but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different.").

of Rights guarantees . . . ."[3]  *Id.* at 3044.

Indefinite detention of a constitutionally-protected object would never pass muster in the First Amendment setting. *Freedman v. State of Maryland*, 380 U.S. 51, 58-59 (1965), held that a law providing for administrative licensing of motion pictures was valid only if "the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film," and "the procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license."[4] *See Teitel Film Corporation v. Cusack,* 390 U.S. 139, 141-42 (1968) (50 days for administrative process not sufficiently prompt, and no provision for prompt judicial decision).

*United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363 (1971), which involved allegedly obscene photographs under a customs law, held that the seizure of literature must give rise to a prompt judicial proceeding, either a criminal prosecution or a forfeiture action, to be consistent with the First Amendment. Unlike the state laws

---

[3]No constitutional right is "less 'fundamental' than" others, and "we know of no principled basis on which to create a hierarchy of constitutional values . . . ." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982).

[4]*Fantasy Ranch Inc. v. City of Arlington*, 459 F.3d 546, 563 (5th Cir. 2006), explained:

First, any restraint before judicial review occurs can be imposed only for a specified brief period during which the status quo must be maintained; second, prompt judicial review of that decision must be available; and third, the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof in court.

8

invalidated in *Freedman* and *Teitel Film*, "it is possible to construe the section to bring it in harmony with constitutional requirements." *Id*. at 368.   To avoid its unconstitutionality, the court construed the statute "to require intervals of no more than 14 days from seizure of the goods to the institution of judicial proceedings for their forfeiture and no longer than 60 days from the filing of the action to final decision in the district court." *Id*. at 373-74.

Here, the policy of New Orleans is not to return a seized firearm until the statute of limitations has elapsed, without regard to the termination of any criminal proceedings or the filing of a civil forfeiture action.   As applied, that policy is unconstitutional.

### B.  A Person Has a Second Amendment Right to His or Her Particular Firearm, a Right Which is Not Extinguished by One's Ability to Acquire Another Firearm

The lower court held that "Defendants have not violated Plaintiff's Second Amendment right to bear arms because Plaintiff does not have a Second Amendment right to the particular firearm seized, and Plaintiff is not prohibited from acquiring another firearm." (citing *inter alia Garcha v. City of Beacon*, 351 F. Supp. 2d 213, 217 (S.D. N.Y. 2005).  Rec. Doc. 61 at 10. The assertion that constitutionally-protected arms may be seized and held indefinitely because the owner can purchase other arms would render the Second Amendment – and in particular the right to keep arms –

nugatory.

The lower court also opined: "While Plaintiff may have a strong interest in his seized gun, possession of that particular gun is not a basic necessity of life, such as income or employment." Rec. Doc. 61 at 12. Yet arms possession – unlike income or employment – is a constitutional right, not to mention that access to a gun may be the difference between life and death.[5] A particular book may not be banned because it is not a basic necessity of life.

The Second Amendment provides in part that "the right of the people to keep and bear arms, shall not be infringed." For the police to refuse to return a seized firearm when the justification has vanished is an "infringement" of the right by any definition. Similarly, the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." It would be an "abridgement" of this right to seize a book for a criminal violation and not return it when charges are dismissed because the owner can obtain other books. The Framers used the terms "infringe" and "abridge" interchangeably.[6]

_____

[5]"[T]he American people have considered the handgun to be the quintessential self-defense weapon." *Heller,* 554 U.S. at 629 (2008).

[6]When the Constitution was proposed without a bill of rights, Samuel Adams proposed an amendment that the Constitution "be never construed to authorize Congress, to infringe the just liberty of the press . . . ." 6 *Documentary History of the Ratification of the Constitution* 1453 (2000). Madison's draft of the Bill of Rights included the proposal that "no state shall infringe . . . the freedom of speech . . . ." 11 *Documentary History of the First Federal Congress* 1291-92 (1992).

The "let him get another gun" argument recalls *Heller*'s statement: "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms ( i.e., long guns) is allowed." *Heller*, 554 U.S. at 629.[7] "[T]he most natural reading of 'keep Arms' in the Second Amendment is to "have weapons." *Id.* at 582.

Implicit in the right to keep arms is the right to have seized arms returned if the reason for the seizure is no longer justified. *Heller* focuses on instances in which arms were seized without justification, but the same principles would apply to the return of seized arms, in that the term "keep arms" was "simply a common way of referring to possessing arms . . . ." *Id*. at 583. As the historical examples cited by *Heller* show, the specific arms that one owns are the same arms the Second Amendment protects.[8]

*Heller* recounts how the Stuart kings used the game laws to confiscate arms from Protestants, leading to the guarantee of the Declaration of Right of 1689: "That the subjects which are Protestants may have arms for their defense . . . ." *Id*. at 592, quoting 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689). "By the time of the

---

[7]*See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").

[8]*E.g.*, *id*. at 583 n.7 ("such Arms as accrued to him by way of Inheritance"); ("Who has been deprived by [the law] of keeping arms for his own defence? What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting *his Gun* on his Chimney Piece . . . ?") (emphasis added).

11

founding, the right to have arms had become fundamental for English subjects. . . .

Blackstone . . . cited the arms provision of the Bill of Rights as one of the fundamental

rights of Englishmen." *Id*. at 593-94, citing 1 Blackstone 136, 139-140 (1765). But

"what the Stuarts had tried to do to their political enemies, George III had tried to do

to the colonists." *Id*. at 594. When "the Crown began to disarm the inhabitants of the

most rebellious areas," it "provoked polemical reactions by Americans invoking their

rights as Englishmen to keep arms." *Id*.

This was dramatically illustrated regarding the citizens of British-occupied

Boston who were desperate to flee after Lexington and Concord. General and

Governor Thomas Gage promised "that upon the inhabitants in general lodging their

arms in Faneuil Hall, or any other convenient place, under the care of the selectmen,

marked with the names of the respective owners, that all such inhabitants as are

inclined, may depart from the town . . . . And that the arms aforesaid at a suitable time

would be return'd to the owners." Proceedings Between Gage and Selectmen, Apr.

23, 1775, quoted in Stephen P. Halbrook, *The Founders' Second Amendment* 83

(2008). But Gage's Redcoats then seized the arms, which would never be returned.

See *id*. at 82-92. The Declaration of Causes of Taking Up Arms of July 6, 1775,

recounted how the Bostonians "delivered up their arms, but in open violation of honor,

. . . the Governor ordered the arms deposited as aforesaid, that they might be preserved

12

for their owners, to be seized by a body of soldiers," and then refused to allow them

to leave Boston.  2 *Journals of the Continental Congress, 1774-1779*, at 151 (1905).

These lessons were remembered when the Constitution was proposed in 1787

without a bill of rights.  Three proposals in the state conventions to guarantee the right

to arms, *see Heller*, 554 U.S. at 604, are relevant here.  First, the Pennsylvania

Minority proposed: "That the people have a right to bear arms . . .; and no law shall

be passed for disarming the people or any of them, unless for crimes committed, or

real danger of public injury from individuals . . . ."  2 *Documentary History of the

Ratification of the Constitution* 623-24 (1976).  If one may be disarmed for "crimes

committed," surely such arms must be returned when charges are dismissed.

Second, Samuel Adams proposed at the Massachusetts convention "that the said

Constitution be never construed . . . to prevent the people of the United States, who

are peaceable citizens, from keeping *their own arms . . . .*"  6 *Documentary History of

the Ratification of the Constitution* 1453 (2000) (emphasis added).  Keeping one's

own arms does not mean other arms that one can buy.

Third, the New Hampshire convention demanded: "Congress shall never disarm

any citizen, unless such as are or have been in actual rebellion."  18 *Documentary

History of the Ratification of the Constitution* 188 (1995).  While not explicitly

excepting crimes, the transgression had to be "actual," not a suspicion that was never

acted upon.

After the Constitution was ratified, James Madison proposed what became the arms guarantee of the Second Amendment without explicit exceptions like the above: "The right of the people to keep and bear arms shall not be infringed . . . ." 4 *Documentary History of the First Federal Congress* 10 (1986). The Federalist Tench Coxe explained that "the people are confirmed by [this] article in their right to keep and bear their private arms." "Remarks on the First Part of the Amendments to the Federal Constitution," *Federal Gazette*, June 18, 1789, at 2. Madison endorsed Coxe's analysis, which was prominently reprinted. *See* Halbrook, *The Founders' Second Amendment*, 257-58. Again, "their private arms" does not refer to arms that one could buy because the police will not return one's own arms.

Similar infringements occurred in Reconstruction, when Southern states enacted the Black Codes to disarm freedmen. *See Heller,* 554 U.S. at 614-16. *McDonald*, 130 S.Ct. at 3036, turned to those historical experiences in holding that "the right to keep and bear arms is fundamental to *our* scheme of ordered liberty," and is "deeply rooted in this Nation's history and tradition . . . ." *McDonald* explained how civil rights legislation and the Fourteenth Amendment were adopted in part to protect the right of African-Americans to keep and bear arms. *Id*. at 3038-43.

Some of this history involved the constitutional duty to return seized arms. In

14

Kentucky, according to the Freedmen's Bureau, "the civil law prohibits the colored man from bearing arms," and "their arms are taken from them by the civil authorities. . . . Thus, the right of the people to keep and bear arms as provided in the Constitution is *infringed . . . .*" *Heller*, 554 U.S. at 614-15, quoting Exec. Doc. No. 70, 39th Cong., 1st Sess., 233, 236 (1866).  However, Senator Willard Saulsbury, who opposed the Civil Rights Bill because it would "take away from the States" the power to declare "that free negroes shall not have the possession of firearms," Cong. Globe, 39th Cong., 1st Sess. 478 (1866), saw the situation differently:

> a negro, in violation of the laws of Kentucky, was found with concealed weapons upon his person. . . . An officer of the Freedmen's Bureau . . . summoned the judge of the court before him, ordered him to deliver up the pistol to that negro, and to refund the fine to which the negro was subject by the law of Kentucky

*Id*. at 915.

Mississippi banned freedmen from carrying a firearm without a license. *McDonald*, 130 S.Ct. at 3038.  One Mississippi judge upheld the law and declared the Civil Rights Act of 1866 void.  *Id*. at 3041, n.24 (citing N.Y. Times, Oct. 26, 1866, p. 2, col. 3).  However, another Mississippi judge struck down the ban, explaining: "Should not then, the freedmen have and enjoy the same constitutional right to bear arms in defence of themselves, that is enjoyed by the citizen?"  N.Y. Times, Oct. 26, 1866, p. 2, col. 3, quoted in Stephen P. Halbrook, *Freedmen, the Fourteenth*

15

*Amendment, and the Right to Bear Arms* 57-58 (1998). The court concluded: "Let the prisoners *be discharged and their arms restored*!" *Id*.

In the above instances, those ordering the return of the firearms presupposed that the Second Amendment protects the right of those who own firearms to have those firearms returned after being seized by authorities who unjustifiably retain them. They did not suggest, as does the lower court here, that a firearm owner is not entitled to return of his or her own firearm following a seizure for a violation of law and subsequent dismissal of the charges, on the basis that the person may acquire another firearm.

## II.  THE CORE SECOND AMENDMENT RIGHT IS FUNDAMENTAL AND IS SUBJECT TO STRICT SCRUTINY, NOT SOME LESSER DEGREE OF SCRUTINY

### A.  The Right is Fundamental and Requires Strict Scrutiny

*McDonald* repeatedly characterized the right as fundamental in holding that the Second Amendment is incorporated through the Due Process Clause of the Fourteenth Amendment. *McDonald*, 130 S.Ct. at 3036, 3050. Its inclusion in the Bill of Rights "is surely powerful evidence that the right was regarded as fundamental in the sense relevant here." *Id*. at 3037. "[T]he Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id*. at 3042.

16

Just as *Heller* rejected rational-basis standard of review, 554 U.S. at 628 n.27,

*McDonald* rejected the power "to allow state and local governments to enact any gun

control law that they deem to be reasonable . . . ." 130 S.Ct. at 3046. "In *Heller*,

however, we expressly rejected the argument that the scope of the Second Amendment

right should be determined by judicial interest balancing . . . ." *Id.* at 3047, citing

*Heller*, 128 S.Ct. at 2820-2821 (554 U.S. at 632-35).[9]

Justice Breyer suggested that the *Heller* majority "implicitly" rejected strict

scrutiny based on *dictum* about "presumptively lawful" restrictions on possession by

felons and in certain locales. *Heller*, 554 U.S. at 688 (Breyer, J., dissenting). Yet a

compelling state interest for narrowly tailored restrictions of these types may be easily

articulated. Exceptions to a right do not preclude strict scrutiny. *See Heller*, 554 U.S.

at 635 (noting First Amendment exceptions and stating that "[t]he Second Amendment

is no different.").[10]

Infringements on core Second Amendment rights, such as existed in *Heller*, are

categorically void, without analysis under a specific standard of review. Restrictions

---

[9]The "interest-balancing inquiry" would allow "arguments for and against gun control" and the upholding of a handgun ban "because handgun violence is a problem . . . ." *Id.* at 634. Interest balancing is a form of intermediate scrutiny. *See id.* at 690 (Breyer, J., dissenting), citing *Burdick v. Takushi*, 504 U.S. 428 (1992).

[10]"No fundamental right – not even the First Amendment – is absolute. The traditional restrictions go to show the scope of the right, not its lack of fundamental character." *McDonald*, 130 S. Ct. at 3056 (Scalia, J., concurring).

17

on the right which are severe but may not be categorical infringements are nonetheless subject to strict scrutiny, in that the right to keep and bear arms is an explicitly-protected, fundamental right.  As stated in *Louisiana Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1498 (5th Cir. 1995), *cert. denied*, 515 U.S. 1145 (1995):

> the constitutional right of private association is not protected absolutely against infringement by the state. . . . As a fundamental right, however, any such infringement is subject to strict scrutiny. . . . Strict scrutiny analysis requires the government to demonstrate that (1) the state action serves a compelling state interest which (2) cannot be achieved through means significantly less restrictive of one's associational freedom.

*United States* v. *Emerson*, 270 F.3d 203, 261 (5th Cir. 2001), *cert. denied*, 536 U.S. 907 (2002), upheld a prohibition on possession of a firearm by persons subject to domestic protective orders because the Second Amendment allows "limited, narrowly tailored specific exceptions . . . ."  Upholding a ban on possession by felons, *United States v. Darrington*, 351 F.3d 632, 635 (5th Cir. 2003), in dictum questioned whether Emerson recognized it "is a 'fundamental right,' in the sense that restrictions on this right are subject to 'strict scrutiny' . . . ." *Id*.  But *McDonald* resolved that issue by calling the right to keep and bear arms a "fundamental right" so many times that one could lose track.[11]

---

[11]That was true to the formulation that a right is "fundamental" if it is "explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Independent*

Only when a fundamental right is not implicated does strict scrutiny not apply. *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 129 S.Ct. 1093, 1098 (2009) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny.") (citation omitted). *See LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005) ("strict scrutiny is employed when a governmental body creates a classification that burdens a fundamental right").[12] The government bears the burden of proof to show that the interests are compelling and that the law is narrowly tailored. *Miller v. Johnson*, 515 U.S. 900, 920 (1995). Defendants here did neither.

### B.  Intermediate Scrutiny or Anything Less Than Strict Scrutiny is Not the Appropriate Standard of Review for a Significant Restriction on the Core Right to Keep Arms

The District Court held: "In applying more than rational basis review, the Court finds that Plaintiff's Second Amendment rights were not violated."  Rec. Doc. 61 at 9, n.2.  It did not reveal what level of scrutiny it was applying, but intermediate

---

*School District v. Rodriguez*, 411 U.S. 1, 17, 33 (1973).

[12]*See also Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 651 n.14 (1985) ("governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied"); *Washington v. Glucksberg*, 521 U.S. 702, 766-67 (1997) (Souter, J., concurring) (citing *Poe v. Ullman*, 367 U.S. 497, 548 (1961) (Harlan, J., dissenting) for proposition that "an 'enactment involving . . . a most fundamental aspect of liberty . . . [is] subject to strict scrutiny'").

scrutiny or any level less than strict scrutiny is erroneous.[13]

Courts have applied "intermediate scrutiny" to restrictions involving persons convicted of violent felonies,[14] persons convicted of misdemeanor crimes of domestic violence,[15] persons subject to domestic violence protective orders,[16] and drug addicts.[17] Applying analogous First Amendment concepts, strict scrutiny applies to "the core right identified in *Heller* – the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense," but "intermediate scrutiny is more appropriate than strict scrutiny for" persons with a criminal history. *Chester*, 628 F.3d at 682-83. Here, Plaintiff has no criminal history.

In sum, intermediate scrutiny has been applied to prohibitions on firearm possession by persons deemed dangerous. To the extent that a standard of review is applicable to restrictions on the core right to keep arms by law-abiding citizens which are not clear categorical infringements, it is strict scrutiny. Here, Defendants'

---

[13]The District Court used the words "compelling interest" and "narrowly tailor[ed]" on one occasion, but engaged in no real analysis of why the interest identified was allegedly compelling, or what different means could have been employed to tailor any restrictions to fit that interest. Rec. Doc. 61 at 9. *See* discussion in Part III., below.

[14]*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010).

[15]*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (*en banc*).

[16]*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010).

[17]*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010).

unwarranted retention of the firearm is a categorical infringement of Plaintiff's right to keep and bear arms, and in the alternative it fails to pass muster as a compelling state interest under the strict scrutiny standard.

## III.  THE CITY'S POLICY OF RETAINING FIREARMS IN ALL INSTANCES DOES NOT SURVIVE STRICT SCRUTINY

For Defendants' policy to survive strict scrutiny, it must be "narrowly tailored to achieve a compelling governmental interest." *Abrams v. Johnson*, 521 U.S. 74, 82, (1997).  Furthermore, it must designed so as to impose the minimum burden on the constitutional right at stake.  See *Louisiana Debating and Literary Ass'n*, 42 F.3d at 1498. The City's retention policy cannot survive under this test, and the District Court's justifications for the policy were misplaced.

### A.  The Interests Asserted to Support Defendants' Actions Are Not Compelling or Even Applicable

The District Court asserted that the retention policy served three state interests. First, it initially argued that this "regulation is permissible because it allows Defendant to keep the firearm away from an arrested drug user." Rec. Doc. 30 at 7.  The Court noted that "In particular, the Fifth Circuit has upheld laws passed by Congress that restrict drug users from possessing firearms. *See United States v. Roach*, 201 Fed.Appx. 969, 974 (5th Cir. 2006) (finding that 18 U.S.C. § 922(g)(3) is

constitutional)." Rec. Doc. 30 at 6.

Although Houston was arrested, there is nothing in the record showing that he personally is or was a drug user. He certainly has not been convicted of a drug crime or any other crime. The District Court's reliance on *Roach* is erroneous. In that case, Roach "*pleaded guilty* of being an addict or unlawful user of a controlled substance in possession of a firearm." *Roach,* 201 Fed.Appx. at 972 (emphasis added). Furthermore, *Roach* was decided before *Heller* and *McDonald*, and the Court applied a rational basis test in upholding 18 U.S.C. § 922(g)(3).[18]

The second and third purported compelling interests relied on by the District Court were the state's interest "in seizing weapons pursuant to a lawful arrest and as evidence of crimes." Rec. Doc. 61 at 9. The interest in "seizing weapons pursuant to a lawful arrest" is a red herring. Houston has not asserted that the police cannot seize a firearm in the possession of one who is arrested. What he has asserted is that, if the individual is not prosecuted or convicted, the City cannot retain it indefinitely. Thus, the cases relied on by the District Court that relate merely to the seizure of a firearm

---

[18]The District Court itself seemed to recognize that reliance on this state interest was faulty. The rationale regarding drug users was included in the September 21, 2010, decision dismissing Houston's complaint against Defendant Cannizzaro. Rec. Doc. 30 at 6-7. However, this purported state interest was  discreetly dropped from the Court's similar but longer analysis in the December 10,  2010 decision.  Rec. Doc. 61.

in connection with an arrest, rather than to its retention, are inapplicable.[19]  The third

state interest–retention for use as evidence–may have some general legitimacy, but is

anything but "compelling" under the facts of this case.  Following  Plaintiff's arrest,

charges were refused by the District Attorney.  Rec. Doc. 61 at  1.  The only time

charges were actually brought was when a warrant was issued for Plaintiff's arrest

three days after he filed this suit.  Rec. Doc. 61 at 2.  The Assistant District Attorney

declined to prosecute, and dropped the charges.  Rec. Doc. 61 at 2-3.  Defendants have

produced  or  alleged  no  evidence  of  an  actual,  continuing  investigation  of  Mr.

Houston.  The alleged need for the firearm as evidence is thus purely speculative,

rather than grounded in the reality of an ongoing investigation or prosecution.

### B.  Defendants' Policy is Not Narrowly Tailored to Meet Constitutional Standards

As noted, *Emerson* presciently held that narrow tailoring is required in Second

Amendment cases.  *Emerson,* 270 F.3d at 261.   Any standard lower than strict

scrutiny for cases involving law-abiding citizens has since been foreclosed by *Heller*

and, especially, *McDonald*.  This Court's pronouncement in *Emerson* that narrow

tailoring is required thus remains in force.  The policy adopted by Defendants is not

---

[19]Inapposite cases cited by the District Court which only relate to the original search or seizure, and do not relate to retention of a firearm after charges are withdrawn, include *Arizona v. Gant*, 129 S. Ct. 1710 (2009); *Hunter v. City of Electra*, No. 7:03-CV-153, 2006 WL 1814150, at *7 (N.D. Tex. June 29, 2006); *Dickerson v. City of Denton*, 298 F. Supp. 537, 540-41 (E.D. Tex. 2004); and *Bemis v. Kelley*, 671 F. Supp. 837 (D. Mass. 1987).

narrowly tailored to protect the exercise of a fundamental constitutional right, but appears designed to thwart it.

A policy designed to protect Second Amendment rights, and to impose the minimum burden on them, would include features such as: retention of the firearm only so long as there is a demonstrable and actual (rather than speculative) need to retain the firearm for an existing prosecution, or where there is an active, good faith, ongoing investigation into bringing charges; return of the firearm if charges have been dismissed and not reinstituted within a reasonable period; a clear, prompt, and inexpensive process for return of the firearm; and in disputed cases, a speedy hearing before a neutral arbiter, in which the burden would be on the state to show a compelling need for retention.

None of those features are present here, because the Defendants and the District Court have adopted a circular interpretation of La. Rev. Stat. § 40:1798(D). That section provides:

> If the seized or forfeited firearm is not contraband, and if the law enforcement agency knows the owner of the seized or forfeited firearm, and if the owner did not commit any violation of any federal or state law or local ordinance in which the seized or forfeited firearm was involved, and if the owner may lawfully possess the seized or forfeited firearm, the law enforcement agency shall return the seized or forfeited firearm to the owner.

There is no contention here that the firearm is contraband, that the New Orleans

police department does not know who the owner is, or that the owner is prohibited from possessing the firearm. Instead, the District Court engaged in a "Catch-22" analysis, stating that:

> In the instant case, section 40:1798(D) is not yet applicable because it is uncertain whether Plaintiff has committed a violation of state law . . . in which his seized firearm was involved . . . . As a result, Defendants cannot return or dispose of Plaintiff's firearm under section 40:1798 until it has been determined whether or not Plaintiff has committed a violation of any law or ordinance.

In other words, Defendants can keep Plaintiff's gun indefinitely because they don't know if they need it. That reverses the constitutional standard, in which there must be a showing, pursuant to an administrative hearing, that Defendants are entitled to retain a firearm. *Ford v. Turner*, 531 A.2d. 233 (D.C. 1987) (notice of right to contest seizure of firearms, and right to hearing, is constitutionally required). It is also clear that imposition of unreasonable delays on the exercise of a constitutional right to bear arms is impermissible. *See Kuck v. Danaher*, 600 F.3d 159 (2d Cir. 2010).

In addition, the District Court's holding that § 40:1798(D) is not available to Plaintiff as a remedy, and that he should have instead filed a contradictory motion under La. Rev. Stat. § 15:41, shows the utter lack of a constitutionally sufficient, narrowly tailored remedy regarding return of seized firearms.

First, § 15:41 is by its express terms *inapplicable*, stating: "If there is a specific

25

statute concerning the disposition of the seized property, the property shall be disposed of in accordance with the provisions thereof."    Section 40:1798(D) specifically applies to return of seized firearms. A remedy is not narrowly tailored if a citizen is required to disregard a statute that is applicable, and proceed under a statute that is, by its terms, inapplicable.

Second, Plaintiff has been deprived of his firearm under § 40:1798(D) on grounds that it might be needed as evidence. Section 15:41 states that property will be returned only if it is "not to be used as evidence or is no longer needed as evidence...." Thus, § 15:41 provides Plaintiff no alternative remedy, because Defendants would have precisely the same rationale for withholding the firearm under § 15:41 as they have asserted under § 40:1798(D).

Third, rather than providing a swift administrative process to avoid deprivation of constitutional rights, § 15:41 requires the Plaintiff to institute legal proceedings in court.  Courts have held that such a remedy for recovery of a seized firearm is constitutionally deficient. *See, e.g., Bryte v. City of La Mesa,* 255 Cal. Rptr. 64 (1989) (statute that required order of Superior Court for seized weapons to be returned to person detained for mental evaluation held unconstitutional due to lack of

administrative remedy).[20]

Instead of being narrowly tailored, Defendants' policy virtually guarantees the wholesale deprivation of Second Amendment rights far beyond any time period when such restrictions might be justified.

## CONCLUSION

The judgment of the district court should be reversed and the case remanded for further proceedings.

Respectfully submitted,

National Rifle Association of America, Inc.
By Counsel

 /s/ Stephen P. Halbrook 
Stephen P. Halbrook*
3925 Chain Bridge Road
Suite 403
Fairfax, Virginia 22030
(703) 352-7276
Fax: (703) 359-0938
Email:  protell@aol.com
*Counsel of Record

---

[20]Again, in its September 21, 2010 Order, the District Court held that § 15-41 needed to be exhausted as a remedy. Rec. Doc. 30 at 2, 10.  The contention that § 15-41 provided a sufficient remedy was omitted without comment in the District Court's Order of December 10, 2010.

/s/ Dan M. Peterson
Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road
Suite 403
Fairfax, Virginia 22030
(703) 352-7276
Fax: (703) 359-0938
Email: dan@danpetersonlaw.com

Counsel for Amicus Curiae

**Certificate of Service**

I hereby certify that I have filed the foregoing electronically this 2d day of May,

2011, using the Court's CM/ECF system, which will automatically provide service

to counsel for all parties who are filing users in the Court's ECF system.  Additionally,

pursuant to his consent, I served an electronic copy by email on:

Craig Malcolm Freeman
Law Offices of Craig M. Freeman
2205 Myrtle Avenue
Baton Rouge, LA 70806
cfreem1@lsu.edu

and a printed copy, together with a CD-ROM electronic copy, by U.S. Mail, postage

prepaid, on:

Eraka V. Williams
City Attorney's Office
for the City of New Orleans
5th Floor
1300 Perdido Street
New Orleans, LA 70112
evwilliams@cityofno.com


                                    /s/ Stephen P. Halbrook
                                    Stephen P. Halbrook

**Certification Pursuant to Fifth Cir. R. 25.2.13 and 25.2.1**

I hereby certify that for the foregoing the required privacy redactions have been made; the electronic submission is an exact copy of the paper document; and the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

/s/ Stephen P. Halbrook
Stephen P. Halbrook

**Certificate of Compliance With Fed. R. App. P. 32(a)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6674 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Word Perfect 12 in Times New Roman 14 point type, except that, in accordance with Fifth Circuit Rule 32.1, Times New Roman 12 point type has been used for the footnotes.

/s/ Stephen P. Halbrook
Stephen P. Halbrook
Attorney for Amicus National Rifle
Association of America, Inc.
Dated: May 2, 2011

30

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR EASTERN DISTRICT OF LOUISIANA
### New Orleans Division

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. AND SECOND AMENDMENT FOUNDATION, INC. | ) ) ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | ) |
| | )   **CIVIL ACTION** |
| | )   **NO. 05-4234** |
| C. RAY NAGIN, Mayor of New Orleans, and | )   **Hon. Carl J. Barbier** |
| | )   **Section "J"** |
| WARREN RILEY, | )   **Magistrate 2** |
| Superintendent of Police, New Orleans | ) |
| | ) |
| **Defendants** | |

## CONSENT ORDER GRANTING PERMANENT INJUNCTION AND DISMISSAL OF REMAINING CLAIMS AGAINST DEFENDANTS, C. RAY NAGIN AND WARREN RILEY

**THIS MATTER** has come before this Court pursuant to the Complaint for Declaratory and Injunctive Relief filed herein on behalf of plaintiffs National Rifle Association of America, Inc. and Second Amendment Foundation, Inc. against C. Ray Nagin and Warren Riley, and the Joint Motion for Entry of Consent Order Granting Permanent Injunction and Dismissal of Remaining Claims Against Defendants, C. Ray Nagin and Warren Riley filed herein on behalf of the Plaintiffs and the Defendants.

**IT IS ORDERED, ADJUDGED AND DECREED** that, C. Ray Nagin, in his capacity as the Mayor of the City of New Orleans, Louisiana and Warren Riley, in his capacity as the duly appointed Superintendent of Police, and officers, agents, servants, and employees of the City, are hereby enjoined and ordered to cease and desist confiscating lawfully-possessed firearms from all citizens, including, but not limited to,

members of plaintiffs National Rifle Association of America, Inc. and Second Amendment Foundation, Inc.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that C. Ray Nagin, in his capacity as the Mayor of the City of New Orleans, Louisiana and Warren Riley, in his capacity as the Superintendent of Police of the New Orleans Police Department, shall attempt to return of any and all firearms which may have been confiscated during the period August 29, 2005, to December 31, 2005, by Defendants, their officers, deputies, agents, servants, and employees of all such persons from members of Plaintiff, National Rifle Association, Inc. or Plaintiff, Second Amendment Foundation, Inc., who lawfully possessed firearms; and all other persons who lawfully possessed them, utilizing the following procedures:

1.     Within one month of the date of this judgment, the Defendants will cause to be conspicuously posted on the website for the City of New Orleans, a recitation of the procedure to be used by individuals seeking the return of their firearm. The website shall include either a form that the person can fill out which will cause the information to be transmitted to the appropriate representative of Defendants in charge of the firearm return or an email address by which persons seeking return of their firearm can transmit their claim. Additionally, it shall include a telephone number, a mailing address, and the physical address where the firearms are stored and may be retrieved.

2.     Within one month from the date of this judgment, the Defendants shall mail notice to all persons to the address identified on the property tags of firearms in the Defendants' possession which were seized from August 29, 2005 through December 31, 2005.

3.      The Defendants shall relinquish possession of the firearm to the claimant upon the claimant presenting: a drivers license or other acceptable form of identification; the make, model and caliber of the firearm, including pre-Katrina identifying characteristics, if any, such as initials, commemorative markings, custom modifications, and the like which could be used to identify the firearm for which the person is seeking return; and a signature by the claimant on an affidavit or other form formulated by defendants, stating that he/she is the owner of the firearm. Proof of ownership by sales receipt or serial number is encouraged, but neither the presentation of the serial number of the firearm nor the presentation of a sales receipt will be required in order for a claimant to obtain possession of his/her firearm.

4.      For each claimant, the Defendants shall run a background check to be sure that the claimant is legally able to possess a firearm.   Defendants shall endeavor to run an instant background check, but in no circumstance should the check take longer than 3 business days.   Once the claimant is background cleared, the firearm will be returned. For those claimants that do not pass the background check, the firearm will be retained for the requisite period.

5.      Should the Defendants follow this procedure, they will be held harmless by the claimant in the event that a claim is made by another person for return of a firearm with a similar description. The Defendants may further require all claimants to sign an affidavit stating that he/she is the owner of the firearm and a "hold harmless" agreement in which the claimant agrees to indemnify and hold the Defendants harmless should a dispute arise as to ownership of a firearm returned under these procedures;

6.      Pending the return of the firearms to their rightful owners, the Defendants shall safeguard and maintain the firearms in such a manner as to prevent further damage to the firearms.

7.      If there are firearms remaining in the possession of the Defendants that have not been claimed two years after the date of this judgment, the Defendants are authorized to dispose of the firearms according to the Defendants' established procedures.

8.      The Court shall maintain jurisdiction over this matter concerning the Defendants' compliance with the terms of this consent judgment.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that as there is no just reason for delay, this Consent Order Granting Permanent Injunction and Dismissal of Remaining Claims Against Defendants, C. Ray Nagin and Warren Riley be entered immediately.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the remaining claims against C. Ray Nagin, individually and in his capacity as the Mayor of the City of New Orleans, Louisiana, and Warren Riley, individually and in his capacity as the Superintendent of Police for the City of New Orleans, in the Complaint for Declaratory Judgment and Injunctive Relief be and they are hereby dismissed, each party to bear its own costs.

New Orleans, Louisiana, this __9th__ day of _____October_____, 2008.

_____
United States District Judge