No. 11-30198

———————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————

ERROL HOUSTON, JR.,

Plaintiff-Appellant

v.

CITY OF NEW ORLEANS; LEON CANNIZZARO,
District Attorney for the Parish of Orleans; WARREN J. RILEY,
Superintendent of the New Orleans Police Department,

Defendants-Appellees

———————

**BRIEF AMICUS CURIAE OF THE NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC., IN SUPPORT OF APPELLANT AND
IN SUPPORT OF PETITION FOR REHEARING EN BANC**

———————

Appeal from the U.S. District Court
for the Eastern District of Louisiana
District Court Civil No. 2:09-CV-4245

Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road
Suite 403
Fairfax, Virginia 22030
(703) 352-7276
Fax (703) 359-0938
dan@danpetersonlaw.com

Stephen P. Halbrook*
3925 Chain Bridge Road
Suite 403
Fairfax, Virginia 22030
(703) 352-7276
Fax (703) 359-0938
Email protell@aol.com
*Counsel of Record

Counsel for Amicus Curiae

# DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, the National Rifle Association of America, Inc. (hereinafter "NRA"), has no parent corporation.  Since it has no stock, no publicly held company owns 10% or more of its stock.


 /s/ Stephen P. Halbrook
Stephen P. Halbrook

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF INTEREST OF AMICUS CURIAE . . . . . . . . . . . . . . . . . . . . 1

STATEMENT PURSUANT TO FED. R. APP. P. 29 (c). . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.  THE SECOND AMENDMENT RIGHT  TO "KEEP ARMS"
INCLUDES ARMS ALREADY POSSESSED. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. BECAUSE THE DEPRIVATION RELATES TO A
CONSTITUTIONALLY PROTECTED OBJECT,
HEIGHTENED DUE PROCESS PROCEDURES
MUST BE SCRUPULOUSLY OBSERVED... . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7). . . . . . . . . . 16

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

# TABLE OF AUTHORITIES

## CASES                                                                    Page

*Aymette v. State*,  21 Tenn. 154 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*District of Columbia v. Heller,* 554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . *passim*

*Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . 12

*Fantasy Ranch Inc. v. City of Arlington*, 459 F.3d 546 (5th Cir. 2006). . . . . . . . . . 13

*Freedman v. State of Maryland*, 380 U.S. 51 (1965). . . . . . . . . . . . . . . . . . . . . . . 12

*Jennings v. State*, 5 Tex.App. 298 (Tex.Ct.App. 1878). . . . . . . . . . . . . . . . . . . . . 8

*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010). . . . . . . . . . . . . . . . . . *passim*

*National Rifle Ass'n v. City of Chicago*, 567 F.3d 856 (7th Cir. 2009),
 *rev'd. sub nom.*, *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) . . . . . . . . 2

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) .. . . . . . . . . . . . . 12

*Teitel Film Corporation v. Cusack*, 390 U.S. 139 (1968). . . . . . . . . . . . . . . . . . . 13

*United States* v. *Emerson*, 270 F.3d 203 (5th Cir. 2001),
*cert. denied*, 536 U.S. 907 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 11

*United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363 (1971). . . . . . . . . . 13

*Walters v. Wolf,* 660 F.3d 307 (8th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Zurcher v. Stanford Daily,* 436 U.S. 547 (1978). . . . . . . . . . . . . . . . . . . . . . . . . 13

## CONSTITUTION AND STATUTES

U.S. Const., Amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const., Amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const., Amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689). . . . . . . . . . . . . . . . . . 4

Militia Act of 1792, 1 Stat. 271 (1792). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## OTHER AUTHORITIES

1 Blackstone 136, 139-140 (1765). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cong. Globe, 39th Cong., 1st Sess. 478 (1866). . . . . . . . . . . . . . . . . . . . . . . . 9

2 *Documentary History of the Ratification of the
Constitution* 623-24 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

4 *Documentary History of the First Federal Congress* 10 (1986). . . . . . . . . . . . . . 7

6 *Documentary History of the Ratification of the
Constitution* 1453 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14

11 *Documentary History of the First Federal Congress* 1291-92 (1992). . . . . . . . 14

18 *Documentary History of the Ratification of the Constitution* 188 (1995). . . . . . . 6

Exec. Doc. No. 70, 39th Cong., 1st Sess., 233, 236 (1866). . . . . . . . . . . . . . . . . 9

*Federal Gazette*, June 18, 1789, at 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2 *Journals of the Continental Congress, 1774-1779* (1905) . . . . . . . . . . . . . . . . 5

Stephen P. Halbrook, *The Founders' Second
Amendment* 83, 257-58 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment,
and the Right to Bear Arms* 57-58 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## STATEMENT OF INTEREST OF AMICUS CURIAE

The National Rifle Association of America, Inc. ("NRA") is a New York not-for-profit membership corporation founded in 1871. NRA has four million individual members and 10,700 affiliated clubs and associations nationwide. Its purposes are to protect the U.S. Constitution, including the right to keep and bear arms for defense of person and property and other lawful purposes; to promote public safety and the national defense; to train law enforcement, the armed forces, the militia, and the people in marksmanship and safety; and to foster the shooting sports and hunting.

The panel decision adversely affects NRA members in the States composing the Fifth Circuit generally and in New Orleans in particular. This case involves the refusal of New Orleans police to return a firearm more than three years after it was confiscated during an arrest and after criminal charges were dropped. The NRA has successfully litigated against the City of New Orleans regarding widespread confiscation of firearms by the City following Hurricane Katrina. *See* Motion for Leave to File Amicus Brief, submitted herewith. The NRA has a strong interest in ensuring that New Orleans' policies of returning seized firearms are consistent with constitutional requirements.

The panel opinion holds that a policy of refusing to return firearms confiscated from citizens is outside the scope of the Second Amendment right to keep and bear arms. The scope and application of the Second Amendment is an issue on which the

1

NRA has expertise. *E.g.*, *National Rifle Ass'n v. City of Chicago*, 567 F.3d 856 (7th Cir. 2009), *rev'd. sub nom. McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) (holding that the Second Amendment applies to the States through the Fourteenth Amendment). This amicus brief seeks to assist the Court by analyzing Second Amendment history and jurisprudence not set forth in the petition for rehearing.

Appellant consents to the filing of this amicus curiae brief. Despite a timely submitted request for consent, none of the Appellees have indicated whether they consent or will file an opposition to this motion. The NRA seeks to file this brief pursuant to its Motion for Leave to File Amicus Brief, submitted herewith.[1]

## ARGUMENT

Noting that some regulation is outside the scope of the Second Amendment, the panel held: "The right protected by the Second Amendment is not a property-like right to a specific firearm, but rather a right to keep and bear arms for self-defense." Panel opinion at 5. Because "Houston has not alleged defendants prevented his 'retaining or acquiring other firearms,'" (citing *Walters v. Wolf*, 660 F.3d 307, 318 (8th Cir. 2011), the panel held that "he has not stated a violation of his Second Amendment right to

---

[1]No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person – other than the amicus curiae, its members, or its counsel – contributed money that was intended to fund preparing or submitting the brief.

keep and bear arms." *Id*.

In dissent, Judge Elrod describes the panel holding as an "atextual, ahistorical rule." Dissent at 15. "*Heller* and *McDonald*[2] make clear that courts may consider only the text and historical understanding of the Second Amendment when delimiting the Amendment's scope." *Id.* at 11.[3] Other courts of appeals recognize the primacy of historical inquiry in ascertaining the contours of the Second Amendment's protections. *Id*. at 12. This court's seminal *Emerson* decision devoted 23 pages to analyzing the Second Amendment's text and history. *United States* v. *Emerson*, 270 F.3d 203, 227-36, 236-260 (5th Cir. 2001), *cert. denied*, 536 U.S. 907 (2002).

This amicus brief analyzes the text and relevant history on whether the right to "keep" arms includes firearms already privately possessed, or is instead limited to firearms that might be acquired in the future. Because the novel rule announced by the panel is supported neither by text nor by history, and conflicts with precedent of the

---

[2]*District of Columbia v. Heller,* 554 U.S. 570 (2008); *McDonald v. City of Chicago,* 130 S.Ct. 3020 (2010).

[3]Although the panel opinion referenced *Heller*'s discussion of measures that are "presumptively lawful" under the Second Amendment, it did not contend that the refusal by authorities to return a firearm seized from a law-abiding individual falls within any of those categories identified by *Heller*. Panel opinion at 5. In fact, the retention of seized firearms does not resemble any of the "presumptively lawful" restrictions, which *Heller* identified as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27, and 627 n.26.

3

Supreme Court and this Circuit, rehearing en banc should be granted.

## I.  THE SECOND AMENDMENT RIGHT  TO "KEEP ARMS" INCLUDES ARMS ALREADY POSSESSED

"[T]he most natural reading of 'keep Arms' in the Second Amendment is to "have weapons." *Heller*, 554 U.S. at 582.  *Heller* also noted dictionary definitions from the time, which included "[t]o retain; not to lose," "[t]o have in custody," and "[t]o hold; to retain in one's power or possession." *Id.*  Implicit in the right to keep arms is the right to have seized arms returned if the reason for the seizure is no longer justified. *Heller* focuses on instances in which arms were seized without justification, but the same principles would apply to the return of seized arms, in that the term "keep arms" was "simply a common way of referring to possessing arms . . . ." *Id.* at 583.  As the historical examples cited by *Heller* show, the specific arms owned by individuals are the same arms the Second Amendment protects.[4]

*Heller* recounts how the Stuart kings confiscated arms from Protestants, leading to the guarantee of the Declaration of Right of 1689: "That the subjects which are Protestants may have arms for their defense . . . ." *Id.* at 592, quoting 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689).  "By the time of the founding, the right to have

---

[4]*E.g.*, *id.* at 583 n.7 ("such Arms as accrued *to him* by way of Inheritance"); ("Who has been deprived by [the law] of keeping arms for his own defence? What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting *his Gun* on his Chimney Piece . . . ?") (emphasis added).

4

arms had become fundamental for English subjects." *Id*. at 593-94, citing 1 Blackstone 136, 139-140 (1765). But "what the Stuarts had tried to do to their political enemies, George III had tried to do to the colonists." *Id*. at 594. When "the Crown began to disarm the inhabitants of the most rebellious areas," it "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Id*.

This was dramatically illustrated regarding the citizens of British-occupied Boston who were desperate to flee after Lexington and Concord. General and Governor Thomas Gage promised "that upon the inhabitants in general lodging their arms in Faneuil Hall, or any other convenient place, under the care of the selectmen, marked with the names of the respective owners, that all such inhabitants as are inclined, may depart from the town . . . . And that the arms aforesaid at a suitable time would be return'd to the owners." Proceedings Between Gage & Selectmen, Apr. 23, 1775, quoted in Stephen P. Halbrook, *The Founders' Second Amendment* 83 (2008). But Gage's Redcoats then seized the arms, which would never be returned. See *id*. at 82-92. The Declaration of Causes of Taking Up Arms of July 6, 1775, recounted how the Bostonians "delivered up their arms, but in open violation of honor, . . . the Governor ordered the arms deposited as aforesaid, that they might be preserved for their owners, to be seized by a body of soldiers," and then refused to allow them to leave Boston. 2 *Journals of the Continental Congress, 1774-1779*, at 151 (1905). The

seizure of and refusal to return privately owned firearms accelerated the American Revolution.

These lessons were remembered when the Constitution was proposed in 1787 without a bill of rights. Three proposals in the state conventions to guarantee the right to arms, *see Heller*, 554 U.S. at 604, are relevant here. First, the Pennsylvania Minority proposed: "That the people have a right to bear arms . . .; and no law shall be passed for *disarming the people or any of them*, unless for crimes committed, or real danger of public injury from individuals . . . ." 2 *Documentary History of the Ratification of the Constitution* 623-24 (1976) (emphasis added). If one may be disarmed for "crimes committed," surely such arms must be returned when charges are dismissed.

Second, Samuel Adams proposed at the Massachusetts convention "that the said Constitution be never construed . . . to prevent the people of the United States, who are peaceable citizens, from keeping *their own arms* . . . ." 6 *Documentary History of the Ratification of the Constitution* 1453 (2000) (emphasis added). Keeping one's own arms does not mean acquiring other arms in the future.

Third, the New Hampshire convention demanded: "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." 18 *Documentary History of the Ratification of the Constitution* 188 (1995). While not explicitly excepting crimes, the transgression had to be "actual," not a suspicion that was never

6

acted upon.

After the Constitution was ratified, James Madison proposed what became the Bill of Rights, including: "The right of the people to keep and bear arms shall not be infringed . . . ." 4 *Documentary History of the First Federal Congress* 10 (1986). The Federalist Tench Coxe explained that "the people are confirmed by [this] article in their right to keep and bear *their private arms*." *Federal Gazette*, June 18, 1789, at 2 (emphasis added). Madison endorsed Coxe's analysis, which was prominently reprinted. Halbrook, *The Founders' Second Amendment*, 257-58. Again, "their private arms" did not refer to arms that one could buy in the future because the state will not return one's own arms.

The Militia Act of 1792 defined the militia as each able-bodied white male citizen aged 18-44 and required each to "*provide himself* with a good musket . . . or with a good rifle. . . ." 1 Stat. 271 (1792), quoted in *Emerson*, 270 F.3d at 234 n.33 (emphasis added). It is inconceivable that the founding generation believed that these individually owned firearms could be confiscated without implicating the Second Amendment right to keep arms.

Precedent from the early Republic also endorsed the right of individuals to "keep" their own private arms. "The citizens have *the unqualified right to keep the weapon*, it being of the character before described . . . ." *Aymette v. State*, 21 Tenn.

154, 160 (1840), quoted approvingly by *Emerson*, 270 F.3d at 232 n.31 (adding emphasis).

A similar distinction was made in *Jennings v. State*, 5 Tex.App. 298 (Tex.Ct.App. 1878). Defendant was convicted of unlawfully carrying a pistol. In construing the right to keep and bear arms under the Texas constitution, the court held unconstitutional the part of the statute that required forfeiture of the weapon. "While [the legislature] has the power to regulate the wearing of arms, it has not the power by legislation to take a citizen's arms away from him. One of his most sacred rights is that of having arms for his own defence and that of the State." Because the defendant "was divested of *his pistol,*" the forfeiture was reversed.

Infringements on the right to keep and bear arms occurred in Reconstruction, when Southern states enacted the Black Codes to disarm freedmen. *See Heller,* 554 U.S. at 614-16. *McDonald*, 130 S.Ct. at 3036, turned to those historical experiences in holding that "the right to keep and bear arms is fundamental to *our* scheme of ordered liberty," and is "deeply rooted in this Nation's history and tradition . . . ." *McDonald* explained how civil rights legislation and the Fourteenth Amendment were adopted in part to protect the right of African-Americans to keep and bear arms. *Id*. at 3038-43.

Some of this history involved the constitutional duty to return seized arms. In

Kentucky, according to the Freedmen's Bureau, "the civil law prohibits the colored man from bearing arms," and "*their arms* are taken from them by the civil authorities. . . . Thus, the right of the people to keep and bear arms as provided in the Constitution is *infringed . . . .*" *Heller*, 554 U.S. at 614-15, quoting Exec. Doc. No. 70, 39th Cong., 1st Sess., 233, 236 (1866) (emphasis added).  However, Senator Willard Saulsbury, who opposed the Civil Rights Bill because it would "take away from the States" the power to declare "that free negroes shall not have the possession of firearms," Cong. Globe, 39th Cong., 1st Sess. 478 (1866), saw the situation differently:

> a negro, in violation of the laws of Kentucky, was found with concealed weapons upon his person. . . . An officer of the Freedmen's Bureau . . . summoned the judge of the court before him, ordered him to deliver up the pistol to that negro, and to refund the fine to which the negro was subject by the law of Kentucky

*Id*. at 915.

Mississippi banned freedmen from carrying a firearm without a license. *McDonald*, 130 S.Ct. at 3038.  One Mississippi judge struck down the ban, explaining: "Should not then, the freedmen have and enjoy the same constitutional right to bear arms in defence of themselves, that is enjoyed by the citizen?"  N.Y. Times, Oct. 26, 1866, p. 2, col. 3, quoted in Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms* 57-58 (1998).  The court concluded: "Let the prisoners *be discharged and their arms restored*!"  *Id*.

9

In the above instances, those ordering the return of the firearms presupposed that the Second Amendment protects the right of those who own firearms to have those firearms returned after being seized by authorities who unjustifiably retain them. They did not suggest, as the panel held here, that a law-abiding firearm owner has no Second Amendment right to return of his or her own firearm.

If citizens have no Second Amendment right to keep the specific firearms they already own, there is no principled difference between retention without justification of guns already seized, and direct seizure of guns without justification in the first place. Under the panel's reasoning, if the police were to disarm an individual, a group, or the residents of an entire municipality, those disarmed would have no Second Amendment protection because they do not have a "property-like" right to the particular guns – they could buy others. Panel Opinion at 5.

If a citizen disarmed by police or prosecutors could not acquire another firearm due to poverty or physical disability, under the panel's test he could not invoke the Second Amendment to obtain return of his gun because he could not show that those specific "defendants prevented" his acquiring replacement arms. Panel opinion at 5.

The panel's rule is limitless. If an individual whose firearm was seized and retained was able to acquire a replacement, the replacement firearm could be seized and kept as well. Because the citizen has no "property-like" Second Amendment interest

10

in the replacement gun, the Second Amendment would not be implicated by a second seizure and refusal to return it. The same would be true of seizure of a third firearm, and so on ad infinitum.

By disregarding the plain meaning of "keep arms" and making no inquiry into history and tradition, the panel's decision jeopardizes core Second Amendment rights. As *Emerson* counseled, Second Amendment rights are subject only to "limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and *not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country.*" *Emerson*, 270 F.3d at 261.

## II. BECAUSE THE DEPRIVATION RELATES TO A CONSTITUTIONALLY PROTECTED OBJECT, HEIGHTENED DUE PROCESS PROCEDURES MUST BE SCRUPULOUSLY OBSERVED.

As with seized items for which First Amendment interests are potentially at stake, the process for return of items which have a Second Amendment interest must be clear, rapid, and carefully followed.

*Heller* made repeated analogies between the First and Second Amendments.[5] *See*

---

[5] *E.g.*, *Heller*, 554 U.S. at 628 n.27 (rational basis "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech . . . or the right to keep and bear arms."); *id.* at 635 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions . . ., but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different.").

*also Ezell v. City of Chicago*, 651 F.3d 684, 706, 708 (7th Cir. 2011) ("Both *Heller* and

*McDonald* suggest that First Amendment analogues are more appropriate" in applying

the Second Amendment; court will "distill this First Amendment doctrine and

extrapolate a few general principles to the Second Amendment context.").

The suggestion that the Second Amendment is not implicated if the plaintiff can

get another gun recalls *Heller*'s statement: "It is no answer to say . . . that it is

permissible to ban the possession of handguns so long as the possession of other

firearms (i.e., long guns) is allowed." *Heller*, 554 U.S. at 629. Such an approach has

long been firmly rejected in First Amendment cases. *See Southeastern Promotions,*

*Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) ("one is not to have the exercise of his liberty

of expression in appropriate places abridged on the plea that it may be exercised in

some other place.").

Indefinite detention of a constitutionally-protected object would never pass

muster in the First Amendment setting. *Freedman v. State of Maryland*, 380 U.S. 51,

58-59 (1965), held that a law providing for administrative licensing of motion pictures

was valid only if "the censor will, within a specified brief period, either issue a license

or go to court to restrain showing the film," and "the procedure must also assure a

prompt final judicial decision, to minimize the deterrent effect of an interim and

possibly erroneous denial of a license."[6]  *See Teitel Film Corporation v. Cusack,* 390 U.S. 139, 141-42 (1968) (50 days for administrative process not sufficiently prompt, and no provision for prompt judicial decision).

*United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363 (1971), held that the seizure of allegedly obscene materials must give rise to a prompt judicial proceeding, either a criminal prosecution or a forfeiture action, to be consistent with the First Amendment. To avoid its unconstitutionality, the court construed the statute "to require intervals of no more than 14 days from seizure of the goods to the institution of judicial proceedings for their forfeiture and no longer than 60 days from the filing of the action to final decision in the district court." *Id*. at 373-74.

Similarly, "Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas,* 379 U.S. 476, 485 (1965)).

Application of these fundamental principles cannot be avoided by any textual difference between the First and Second Amendments.  The Framers used the terms

---

[6]*Fantasy Ranch Inc. v. City of Arlington*, 459 F.3d 546, 563 (5th Cir. 2006), explained:

First, any restraint before judicial review occurs can be imposed only for a specified brief period during which the status quo must be maintained; second, prompt judicial review of that decision must be available; and third, the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof in court.

13

"infringe" and "abridge" interchangeably.[7]  *McDonald* refused "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *McDonald*, 130 S.Ct. at 3044.

In its due process analysis, the panel opinion did not require that swift, clear administrative remedies be provided, as is necessary when the seized object has constitutionally protected status.  Instead, that decision relegated Houston to a judicial remedy that on its face appears inapplicable, and did not require an administrative procedure with affirmative notice by the City to apprise Houston of his rights.  The failure to require a process commensurate with the constitutional right at stake is an additional reason why this appeal should be reheard by the court en banc.

## CONCLUSION

The Petition for Rehearing En Banc should be granted.

---

[7]Samuel Adams proposed that the Constitution "be never construed to authorize Congress, to infringe the just liberty of the press . . . ."  6 *Documentary History of the Ratification of the Constitution* 1453 (2000).  Madison proposed that "no state shall infringe . . . the freedom of speech . . . ." 11 *Documentary History of the First Federal Congress* 1291-92 (1992).

Respectfully submitted,

National Rifle Association of America, Inc.
By Counsel

 /s/ Stephen P. Halbrook 
Stephen P. Halbrook*
3925 Chain Bridge Road
Suite 403
Fairfax, Virginia 22030
(703) 352-7276
Fax: (703) 359-0938
Email:  protell@aol.com
*Counsel of Record

/s/ Dan M. Peterson 
Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road
Suite 403
Fairfax, Virginia 22030
(703) 352-7276
Fax: (703) 359-0938
Email: dan@danpetersonlaw.com

Counsel for Amicus Curiae

**Certificate of Compliance With Fed. R. App. P. 32(a)(7)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(A) and (B) because this brief contains fewer than fifteen pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Word Perfect 15 in Times New Roman 14 point type, except that, in accordance with Fifth Circuit Rule 32.1, Times New Roman 12 point type has been used for the footnotes.

/s/ Stephen P. Halbrook
Stephen P. Halbrook
Attorney for Amicus National Rifle
Association of America, Inc.
Dated: March 28, 2012

16

**Certificate of Service**

I hereby certify that I have filed the foregoing electronically this 28th day of

March, 2012, using the Court's CM/ECF system, which will automatically provide

service to counsel for all parties, including appellant Errol Houston, Jr., and appellees

the City of New Orleans, the District Attorney, and the Superintendent of the New

Orleans Police Department, and that in addition I served a paper copy and CD-ROM

on:

Eraka V. Williams
City Attorney's Office
for the City of New Orleans
5th Floor
1300 Perdido Street
New Orleans, LA 70112
evwilliams@cityofno.com

/s/ Stephen P. Halbrook
Stephen P. Halbrook